Estate of Nowlin Randolph, Deceased, Marjorie M. Randolph, Independent Executrix, and Marjorie M. Randolph v. Commissioner.
Estate of Randolph v. Commissioner
Docket No. 180-67.
United States Tax Court
T.C. Memo 1970-324; 1970 Tax Ct. Memo LEXIS 38; 29 T.C.M. (CCH) 1481; T.C.M. (RIA) 70324; November 23, 1970, Filed Robert M. Randolph, for the petitioners. Robert J. Curphy, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable years 1963, 1964, and 1965 in the respective amounts of $1,261.26, $1,147.68, and $1,168.81. Certain issues having been conceded, the only issues remaining for decision are the useful life of a metal building owned by petitioner and the salvage value thereof. Determination of these issues will necessarily dispose of certain adjustments made to allowable deductions for medical expenses and sales taxes which are in issue only because they depend upon the proper amount of adjusted gross income. 1482 Findings of Fact
*39 Some of the facts have been stipulated and are incorporated herein by this reference. Marjorie M. Randolph (hereinafter referred to as petitioner) was a legal resident of Houston, Texas, at the time of the filing of the petition. Nowlin Randolph was also then a legal resident of Houston, Texas; however, he died on April 8, 1970, and on May 11, 1970, petitioner was appointed independent executrix of his estate. Petitioner and Nowlin Randolph filed their joint Federal income tax returns for the taxable years 1963, 1964, and 1965 with the district director of internal revenue, Austin, Texas. On May 3, 1957, petitioner purchased as her separate property a commercial building and two acres of land located at 12230 Robin Boulevard, Houston, Texas, for $76,482.96. At the time of purchase, she made an allocation of $8,508.96 to the land and $67,974.00 to the improvements. Of the amount allocated to the improvements, $7,974.00 was set up in a salvage account. Petitioner purchased the property subject to the existing lease between the seller as lessor and the Gulf States Paint Company as lessee. This lease was executed on September 29, 1953. The lessor agreed to commence the construction *40 of certain improvements on the property in accordance with plans and specifications attached to the lease. The lease was to extend for a period of 15 years from the date the above-mentioned improvements were ready for occupancy. The lessee was granted options to renew the lease for 3 successive 5-year terms. Rental for such renewals was to be determined under a formula provided in the lease. At the end of 10 years after the commencement of the 15-year term of the lease, the lessee had the option to purchase the land and improvements at a price determined by appraisal. The lessee also had a similar option at the end of the 15-year primary term and at the end of any renewal thereof. The lessee agreed to pay a cash rental of $700 per month. The lessee also agreed to pay for all electricity, gas, water and other utilities, all ad valorem taxes assessed against the property and all fire and extended coverage insurance premiums on the improvements. The lessee agreed to keep the leased premises and all improvements thereon (except the roof and exterior walls) in a good state of repair at all times, making such replacement as necessary. The lessee also agreed to repair all damage to the *41 improvements caused by its negligent acts, ordinary wear and tear excepted. The lessor agreed to repair the roof and exterior walls when necessary. The construction of the improvements was completed in January 1954. The land and improvements have been occupied continuously by Gulf States Paint Company since February 1, 1954. On December 13, 1968, a renewal was executed extending the original 15-year term of the lease for 5 years from February 1, 1969 to January 31, 1974. The terms of the renewal were substantially the same as the original lease, except that the cash rental was increased to $834 per month. The improvements consisted of a metal building with an attached masonry office structure, located at the east end of the metal building. The office building was constructed of 6-inch clay hollow tile block walls, a concrete slab floor and a tar and gravel roof. It had a floor area of 960 square feet. This building was divided into smaller offices by sheetrock partitions. It had an air conditioning and heating system and lavatories and was equipped as a modest office in an industrial area. The main part of the building was constructed to accommodate the lessee's paint manufacturing *42 business in an assembly line process. It consisted of a concrete slab and metal building, occupying an area 60 feet in width and 235 feet in length or 14,100 square feet. The metal building had steel columns along the perimeter of the building up to the eaves and from there steel trusses continued up to the apex of the roof. There were no joists or other objects that would hinder using the space up to the roof itself. The columns and trusses were solid structural steel shapes. These were connected to one another by steel girths and purlins, forming the structural frame of the building. The walls and roof of the metal building were made of 28-gauge galvanized, corrugated steel sheet metal. The sheet metal was attached to the steel frame by the use of galvanized or cadmium-plated screws. The screws were self-tapping and the force of driving the screw through the sheet metal into the structural frame broke the cadmium plating on the screw. The pressure also broke the galvanized protective covering on the sheet metal and the insert in the structural steel frame. There were windows in the walls made of steel sash. 1483 There were also a number of sliding steel doors. Attached to *43 the roof were steel gutters and downspouts. The metal building was supported by a structural concrete slab. The slab was specially reinforced with steel rods in order to support the weight of the lessee's equipment and to withstand the vibration caused thereby. The slab was also built to withstand the wear caused by the traffic of the lessee's vehicles on small hard rubber wheels, carrying heavy loads. At the base of each steel column, there were concrete footings. There were also grade beams on the perimeter of the building and connecting grade beams between the columns inside the building to tie the footings together. These footing were meant to carry the main load of the building. The lessee's business required that a sewer be built into the concrete slab. The building also had an electrical power system especially designed to meet the needs of the lessee's business. On the property, a railroad siding was also constructed to meet the needs of the lessee's business. On July 3, 1960, petitioner's property was substantially damaged by a chemical fire that produced an intense heat. The structural steel frame and sheet metal were completely destroyed. The masonry office building *44 was damaged to the extent of about 15 or 20 percent. The northwest part of it was unusable because the roof, the masonry walls, and windows had been burned. One inch to an inch and a quarter was scalded off the top of the concrete slab in the metal building, damaging it to the extent of 15 to 20 percent. The steel reinforcement and the footings in the slab were not damaged. The fire left the slab in the condition of an unfinished structural slab. The petitioner undertook to repair the damage caused by the fire and by August 1960 had completely restored the buildings. The frame, roof, and walls of the metal building were completely rebuilt, using the same type of steel frame and sheet metal as had been used in the original construction. The plans and specifications attached to the lease were followed with no changes, except to add a fire wall required by city ordinances. A concrete topping of 2 or 3 inches was placed on the concrete slab according to how much scalding had taken place. In order to prevent the topping from breaking up because of the traffic of the lessee's wehicles thereon, a steel mesh was placed in the topping. The cost of this reconstruction was $47,750. As a result *45 of the fire, petitioner received an insurance recovery of $48,125. The metal building industry began after World War II as a result of the experience of the military with Quonset and similar type buildings. Initially such buildings were built with 30-gauge sheet metal. Subsequently, the industry began using 28-gauge sheet metal and is now using 26-gauge metal. Thicker metal was used in order to better withstand deterioration. Petitioner's building was built right after the metal building industry began. At that time, it was a typically designed steel building as far as construction, windload, and deadload are concerned. At the time of the reconstruction after the fire, it was as strong and as permanent as other steel buildings being constructed at that time. Initially metal buildings were constructed of galvanized metal which had no other coating. In 1965, the industry commenced using galvanized sheet metal that had either a vinyl or an epoxy coating. The vinyl and epoxy covered sheet metal was attached to the structural frame by screws using a neoprene gasket that keeps the screw from breaking the protective covering of the sheet metal. Thereafter ordinary galvanized sheet *46 metal, such as was used on petitioner's building, was no longer used because the maintenance on it was too great compared to the vinyl covered sheet metal which offered more protection against deterioration and was more attractive since it had a factory applied coloring. In the metal building industry, the new material is generally warranted against defects for a period of 5 years, but under some circumstances is warranted for 10 years. Petitioner's building is located in the community of Almeda, 12 miles south of the central part of the ctiy of Houston. The general climate of the area is semi-tropical. At the time petitioner purchased the property, there were only two or three buildings located in the area. Beginning in 1960, the Houston area began to become highly industrialized. The area surrounding petitioner's building is now a heavily populated industrial area. The effect of industrialization has been to increase the amount of petro-chemical pollutants in the atmosphere. The pervailing winds carry the pollution to the area of petitioner's building. The moisture present in the atmosphere combines with the pollutants and any other foreign substance in the area. This has a *47 1484 deteriorating effect on sheet metal eventually leading to rust. At the time of trial, it had been 8 1/2 years since the damage caused by the fire to petitioner's buildings had been repaired, and the metal building exhibited the deterioration that is common to such buildings of this age. The steel colmuns and trusses constituting the building's framework showed no evidence of deterioration or corrosion. Nor did the building's roof show any signs of deterioration. However, the remainder of the building showed the effects of the deterioration caused by exposure to a polluted atmosphere. The screws that attach the sheet metal to the framework had started to rust. The sheet metal around the screws was also rusted since the protective galvanized covering had been broken when the screws were driven. This had the effect of lessening the ability of the sheet metal walls to withstand windloads. The rust would continue to spread unless it was repaired. At the time of trial, none of the sheet metal had come loose from the framework. A layer of rust had also begun to develop on some sections of sheet metal unrelated to the rust around the screws. It had not yet developed to a built-up *48 crust, but would continue to expand unless it was repaired. On the north side of the building in the area where the lessee mixed paint, there was considerable rust. The sliding doors and the jamb and still sections of every window showed the presence of rust. The gutters and downspouts had also begun to rust, one small section of gutter being completely rusted out. The metal portion of the building also showed the effects of the lessee's use of it. The sliding doors were bent and damaged as a result of the lesse's vehicles hitting them. Combined with the rust, this interferred with the proper operation of the doors. A number of small holes had been cut in the sheet metal, and it was also dented and gashed in a few places as a result of being hit by the lessee's vehicles. The outside of one wall, over an area of about 300 square feet, was coated with a residue from the lessee's operations, as was another area on the interior. While it was there this residue protected the underlying metal. However, it was flaking off and in so doing eroded the protective galvanized covering of the metal. As of the time of trial, the metal portions of the building were still generally in a serviceable *49 condition. However, the deterioration of the metal will continue unless it is repaired. It would be possible to remove the rusted screws, plug the holes, drill new holes, and drive new screws to keep the sheet metal attached to the framework. However, it would be less expensive to replace the sheet metal. As an alternative, it would be possible to sand the rust oxidation off the metal and apply 2 coats of metal paint for a cost of less than half the cost of replacing the sheet metal. The other damage to the sheet metal could be repaired by replacing the damaged sections. The windows could also be repaired by replacing them with new ones. Ordinary maintenance will not take care of all the damages caused by pollution. Eventually the rust and deterioration will become so extensive that the cost of repair will be prohibitive in terms of the value of the building. The concrete slab in the metal building also showed the effects of the lessee's use thereon of its heavy vehicles on small hard rubber wheels. There were numerous hairline cracks surrounding areas where sections of the slab were joined, there were other larger cracks, and the topping was beginning to break up in some areas. *50 As of the time of trial, the slab was still in a serviceable condition, but if subjected to the same use a new concrete topping would be necessary in a few years. The masonry office building was in a generally good condition. The mortar between the tile blocks was subjected to a range of temperature changes since this building was air conditioned. As a consequence of the resulting expansion and contraction, slippage and fine hairline cracks began to develop. This condition will worsen with the passage of time and it will become necessary to make repairs. As of the time of trial, there was a similar metal building located a few hundred feet north of petitioner's property. This building was also used for the manufacture of paint. A small portion of it, about 40 feet by 80 feet, had been built around 1953 and its size had been increased over the years. Over a period of years there had been consistent and extensive repairs, including the replacement of some of the sheet metal. While such building showed considerable rust, it was in a serviceable condition. 1485 There was also in the area of petitioner's building another similar metal building 21 years old at the time of trial *51 which was constructed and being used by the Metallic Building Corporation. The Metallic Building Corporation, which had built petitioner's building, was in the business of manufacturing steel buildings and hence kept its own building in an excellent state of repair. On the joint Federal income tax returns for the taxable years 1963, 1964, and 1965, petitioner claimed a useful life for her building of 12 years from the date of purchase in May 1957 and a salvage value of $7,974, and claimed a deduction for depreciation of $5,000 per year. In the notice of deficiency, the respondent determined that as of January 1, 1963, petitioner's building had a remaining useful life of 30 years. He also reduced the basis of the building by $375 to $67,599 and the salvage value by $375 to $7,599 in order to reflect the difference in the amount of the insurance recovery and the cost of restoring the building after the fire in 1960. He, therefore, computed the allowable deduction for depreciation to be $1,055.56 per year. He also redetermined the amount of allowable deductions for medical expenses and sales tax to reflect the changes in adjusted gross income. Ultimate Findings of Fact As of *52 January 1, 1963, the remaining useful life of petitioner's building was 17 years, and its salvage value was $2,000. Opinion Section 167(a) of the Internal Revenue Code of 1954 provides as a depreciation deduction a reasonable allowance for exhaustion, wear and tear (including a reasonable allowance for obsolescence) of property held for the production of income. The issues presented for decision in this case are the useful life as of January 1, 1963, of a metal building with an attached masonry office building owned by the petitioner, and the salvage value thereof. The parties agree that the two buildings should be considered as a whole for purposes of determining useful life. Although the masonry office has a longer physical life than the metal building, it has no usefulness except in conjunction with the metal building. Thus, the useful life of the entire building will be governed by the useful life of the metal building. The respondent contends that the useful life of the building was 30 years as of January 1, 1963. The petitioner on the other hand contends *53 that the useful life was 12 years from the date of her acquisition of the building in May 1957, which would leave a remaining useful life of about 6 1/2 years as of January 1, 1963. As pointed out by the Supreme Court, the useful life of an asset is not necessarily its physical life, but rather "the number of years the asset is expected to function profitably in use." Massey Motors, Inc. v. United States, 364 U.S. 92. For purposes of determining the building's useful life, both parties cite and rely upon section 1.167(a)-1(b) of the Income Tax Regulations, which provides as follows: (b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the *54 factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. *55 * * * At the trial each party offered the opinion testimony of an expert witness as to the useful life of the building. The testimony of petitioner's witness was to the effect that 1486 the maximum useful life of the building with proper maintenance would be 12 years from the date of its reconstruction in August 1960. The respondent's witness testified that the useful life of the building would be 35 years from such date. Upon a careful consideration of the testimony of these witnesses as well as all the other evidence of record, we find ourselves unable to accept the estimate of useful life of either witness as being determinative here. The depreciation deduction is to be properly determined upon the basis of the facts known to exist, or reasonably anticipated, at the end of any taxable year in question. See Morganton Full Fashioned Hosiery Co., 14 T.C. 695. Each expert witness attempted to support his conclusion upon the basis of an inspection of the building made shortly before the trial in this case. Neither had made an inspection during the years in question. Petitioner's *56 witness described the deterioration that the building had undergone up to the time of the trial and made estimates of the effectiveness and expenses of making repairs. A number of the examples of deterioration observed by him, such as holes in the sheet metal, dents in the sliding doors, etc., could be repaired. Much of this damage appears to have been caused by the action of the lessee, and we note that under the terms of the lease the lessee was obligated to repair such damage. This witness also took into consideration the extent to which the building had rusted. The cause of the rust was the industrial pollution in the atmosphere. The evidence shows that much of the rust damage could be repaired, and in this connection we note that under the lease agreement the petitioner was obligated to make necessary repairs to the exterior walls. According to this witness' estimate, the useful life of the building would expire about August 1972. We think that the building had a longer useful life than estimated by him. Despite the evidence of rust and other deterioration the building was still in a generally serviceable condition at the time of trial, which was about 8 1/2 years after it was *57 reconstructed, and we note that in December 1968 the lessee renewed the lease for an additional period of 5 years ending January 31, 1974. It also appears that at the time of trial there were two similar metal buildings that had existed for 16 and 21 years, respectively, albeit with extensive repairs. The respondent's witness had no detailed knowledge of the conditions, particularly regarding pollution, in the area of the petitioner's building. We think he gave inadequate consideration to the effect of rust and deterioration upon the building. He had no familiarity with the construction industry, and we are unable to give full effect to his conclusions as to the effectiveness of the repairs in prolonging the useful life of the building. Petitioner argues that the useful life of the building should still be computed as of her date of acquisition, May 1957. She maintains that the reconstruction of the building after the fire in 1960 was merely a repair job and did no more than restore the building to the condition it was in before the fire. This contention is not supported by the facts. The metal portion of the building was completely replaced by new material. Since the metal portion *58 of the building is the main subject of controversy, as far as useful life is concerned, we think it is reasonable to conclude that the building was restored not merely to the condition it was in before the fire, but to the condition of a new building as it had been at the time of its original construction in 1954. Indeed, petitioner's own witness based all of his testimony as to the building's useful life on the assumption that in effect a new building had been constructed after the fire in 1960. Accordingly, in determining the useful life of the building we think it should be considered to have been the equivalent of a new building after its reconstruction in 1960. Petitioner further states on brief, in support of the claimed useful life, that the building is a special purpose building, apparently in an attempt to bring it within the limitations prescribed for special purpose buildings in Rev. Proc. 62-21, 1962-2 C.B. 418, which classifies special purpose buildings with the equipment they house, allowing their useful lives to be determined by reference to the guidelines for *59 the appropriate equipment. As used in this context, special purpose buildings are defined as "structures which are an integral part of the production process and which, under normal practice, are replaced contemporaneously with the equipment which they house, support or serve." Petitioner has pointed to no evidence that would bring her building within this definition. Reference is made only to the facts that the main 1487 portion of the building was constructed of steel rather than more expensive masonry; that the concrete slab was reinforced and contained a sewer; that there was an electrical system capable of handling the lessee's needs; and that there was a railroad siding. None of these facts, either standing alone or in conjunction with one another, bring petitioner's building within the definition of a special purpose building. While all of the special features referred to were incorporated to meet the particular needs of the lessee's business, it was not shown that any of them would in any eventuality make it impossible for anyone else to use the building. Under the circumstances, we think, therefore, that petitioner's characterization of her building as a special purpose *60 building is without merit. Petitioner further argues that her building became obsolete during the 2 or 3 years immediately before the trial. This argument is based on the fact that beginning in 1965 the metal building industry began using galvanized sheet metal that had either a vinyl or epoxy coating, and that thereafter metal buildings were no longer constructed with the same type sheet metal as had been used in petitioner's building. Petitioner's argument would have force if she were in the metal building industry, instead of owning a metal building. However, she has shown no facts to prove that the change in the industry has rendered her building obsolete for the purposes for which she is using it. The fact that the newer buildings may have a longer useful life does not indicate that her building has ceased to be useful to her. On the contrary, the facts show that shortly before trial the lessee renewed the lease for an additional 5 years. Finally, petitioner has not shown that the facts upon which she relies were to be reasonably anticipated during any of the years in question. In the exercise of our best judgment, and in light of the applicable principles, we have concluded *61 and have found as a fact that the remaining useful life of petitioner's building as of January 1, 1963, was 17 years, and such useful life will be used in the computation of the depreciation deduction for each of the years in question. The parties have agreed that the basis of the building as originally claimed by the petitioner is to be reduced by $375, representing the excess of the insurance recovery over the cost of reconstructing the building. There remains the question of the salvage value of the property. [1] Respondent has conceded that if we find a useful life longer than claimed by petitioner, an adjustment should be made to the original salvage value claimed by petitioner of $7,974. We are satisfied from the evidence, including the testimony of petitioner's expert witness, that the salvage value would be far less than $7,974 at the end of the building's useful life. The evidence presented on this subject is not as complete as might be desired. However, we have exercised our best judgment and have found as a fact, and hold, that the reasonable salvage value of petitioner's building is $2,000. *62 Decision will be entered under Rule 50. 1488 Footnotes
1. Section 1.167(a)-1(c) of the Income Tax Regulations provides in part as follows: (c) Salvage. (1) Salvage value is the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels. However, if there is a redetermination of useful life under the rules of paragraph (b) of this section, salvage value may be redetermined based upon facts known at the time of such redetermination of useful life. Salvage, when reduced by the cost of removal, is referred to as net salvage. The time at which an asset is retired from service may vary according to the policy of the taxpayer. If the taxpayer's policy is to dispose of assets which are still in good operating condition, the salvage value may represent a relatively large proportion of the original basis of the asset. However, if the taxpayer customarily uses an asset until its inherent useful life has been substantially exhausted, salvage value may represent no more than junk value. Salvage value must be taken into account in determining the depreciation deduction either by a reduction of the amount subject to depreciation or by a reduction in the rate of depreciation, but in no event shall an asset (or an account) be depreciated below a reasonable salvage value. * * *↩